## No. 26544

## The People of the State of Colorado v. Marvin Louis Bynum

(556 P.2d 469)

Decided November 1, 1976. Opinion modified and as modified rehearing denied December 6, 1976.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, Janet Lee Miller, Assistant, for plaintiff-appellee.

Rollie R. Rogers, State Public Defender, James F. Dumas, Jr., Chief Deputy, Mary G. Allen, Deputy, for defendant-appellant.

*In Department.*

Opinion by MR. JUSTICE HODGES.

Defendant-appellant Bynum and Leslie Roy Bell were convicted of robbing[1] a young couple in a restaurant parking lot. They were apprehended shortly after the robbery on the strength of the victims' descriptions of their assailants. The appellant and Bell were in possession of the money clip and purse taken from the victims, together with the approximate amount of money taken from them. At their joint trial, their chief defense was that Bell was under the influence of drugs during the robbery and therefore was unable to form the specific intent to rob and was also unable to conform his conduct to the law by reason of intoxication from drugs. Bynum based his defense on the fact that he did not participate in the robbery even though he was present and that he was totally surprised by Bell's drug-induced behavior. Bynum's appeal to this court centers on issues relating to the proof of the mental condition of Bell and himself at the time of the robbery. We affirm Bynum's judgment of conviction.

---

[1] 1971 Perm. Supp., C.R.S. 1963, 40-4-301(1). Now section 18-4-301(1), C.R.S. 1973.

## I.

Reversal is urged on the ground that the trial court erred in refusing to allow a psychiatrist to testify as to the use of sodium amytal tests on defendant Bell when evaluating Bell's mental condition at the time of the robbery.

The trial court's refusal was premised on an *in camera* hearing on the defendants' offer of proof. At this hearing, two medical experts testified. Sodium amytal is popularly misnomered as a "truth serum," and as explained by the defendant's expert witnesses, the drug acts as a depressant which is sometimes used as a diagnostic tool by psychiatrists to reduce a patient's inhibitions so that his subconscious impressions might be more deeply probed. *See also State v. Sinnott*, 24 N.J. 408, 132 A.2d 298 (1957), which contains a well documented discussion about sodium amytal and its uses. According to one expert's testimony, while sodium amytal might be helpful in releasing information buried in the subconscious, it has doubtful value when used to elicit that which is consciously suppressed or to obtain confessions of crime.

The defense proposed to use the psychiatrist's testimony as to his use of the drug only for the limited purpose of establishing the basis of his opinion that defendant Bell was under the influence of drugs, though not for the purpose of proving the truth of the statements made by Bell during the tests. The defense argues that by so limiting the purposes for which the tests were proposed to be admitted as evidence, the objection to the untrustworthiness of the test as a truth telling device could have been avoided.

■ We conclude that the trial court did not abuse its discretion by refusing testimony concerning the tests even for this limited purpose. It is within the special province and competence of the trial court to determine the relevancy of evidence at trial, and for the following reasons, we agree with the trial court's rejection of this evidence.

■ The psychiatrist called by the defense admitted that the sodium amytal test played only a small part in his evaluation of Bell, and it was merely corroborative of his previously formed opinion, derived from other sources, that Bell was under the influence of drugs during the robbery. In fact, the psychiatrist never personally conducted a sodium amytal test on Bell, but instead, merely relied on a transcript of statements made by Bell during a test given by another psychiatrist. Furthermore, the experts called by the defendants admitted that such testing is often unreliable and quite dependent on various factors, such as, the dosage given to the individual tested and the doctor's familiarity with that individual.

The trial court had to weigh the several difficulties and precautions that would be required if any mention of the sodium amytal tests were injected as issues into the trial. The misleading reputation of the drug as a "truth serum" might have made it difficult to adequately instruct the jury

to confine their considerations to the limited purpose for which the tests were admitted as to defendant Bell. Such confusion may have been particularly acute in this case where the tests would have been admitted not to establish this defendant's general mental proclivities, but more specifically, to support the defense theory that defendant Bell was intoxicated by drugs at the time of the robbery. In this latter regard, the mere willingness of defendant Bell to take such a test on such a limited inquiry may have improperly given credence to the defendant's assertions.[2]

Based on these factors, we reiterate that the trial court did not abuse its discretion and did not commit error in refusing to admit the testimony on the sodium amytal testing in this particular case.

## II.

■ The appellant also contends that he was denied due process of the law because a videotape of their booking at the police station on the night of the robbery was not made available to him by the People. He argues that the videotape could have been critical evidence as to their mental condition and demeanor on the night of the robbery.

The Colorado Springs police department routinely videotapes the booking of individuals at the police station upon their arrest. The booking procedure normally consists of receiving and inventorying the person's effects in his presence. When the possible existence of such tapes of defendants became known to defense counsel, they requested the court to order the tapes preserved. The trial court so ordered but it was then too late. The videotapes involved had been erased in accordance with police department policy to erase videotapes for reuse after sixty days. There is no indication that the tapes were erased because they might have had some usefulness as evidence for the defense. The district attorney was thus powerless to comply with the order of the trial court.

In refusing to dismiss the charges against the defendants because of the erasure of the tapes, the trial court ruled that the defendants were not prejudiced. We agree that the videotapes were not shown to be sufficiently material to the defense as to require dismissal of the charges.

In support of his position, appellant cites *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), which set forth the conditions under which the suppression of evidence may deny a defendant due process. However, these cases were concerned with the *suppression* of *material* evidence *after* the prosecution received a *specific request* to produce such evidence. *See United States v. Agurs*, 427 U.S. 97, 96

---

[2] *Compare Mills v. People*, 139 Colo. 397, 339 P.2d 998 (1959), in which we held that the impact upon the jury of a defendant's refusal to submit to a lie detector test might have been more devastating than a disclosure of the results of such a test, if the fact of the refusal had been introduced after a proper foundation had been laid showing how the appartus functioned.

S.Ct. 2392, 49 L.Ed.2d 342 (1976). These cases are distinguishable on their facts from the instant case where the prosecutor could not produce the evidence because it was routinely destroyed before its possible value, and quite possibly its existence, was made known to the prosecutor through a request from the defense.

On the other hand, the instant case is similar to that addressed by the court in *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). There the Supreme Court of the United States held that a defendant's constitutional rights were not violated when the government could not produce its tape recordings of an interrogation of a witness because it failed to locate them. The court noted that the record was devoid of any credible evidence that they were suppressed by the government. The court also observed that the subject matter of the tapes was disclosed through the detailed testimony of several government agents. The court, however, did not state which, if either, of the two factors — the absence of suppression or the lack of materiality of the missing evidence — was dispositive. *See* Comment, *Judicial Response to Governmental Loss or Destruction of Evidence*, 39 *U. of Chi. L. Rev.* 542 (1972), for an excellent discussion of the current state of the law with reference to the issues presented when there is a governmental loss or destruction of evidence.

We also do not have to reach the question whether, or under what circumstances, an innocent destruction of material evidence mandates dismissal. Here, the record was devoid of any concrete indications that the missing videotapes were *material* evidence. The tapes of the booking procedure were remote and only incidental to the events for which defendant was charged. Secondly, evidence of the demeanor of the defendants was amply available through the testimony of several eyewitnesses and experts called by both the People and the defendants. Finally, there was no substantial showing that the defendants' behaviour was unusual during their booking procedure, but to the contrary, the overwhelming evidence is that they were calm, cooperative and spoke with no apparent difficulty.

In *United States v. Agurs, supra*, the court announced the standard of materiality that should apply in cases where the prosecution, whether by design or accident, failed to disclose information in its possession to the defendant who had not yet specifically requested such information. The court cautioned that the "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Consequently, the court held that the proper test is not one of deciding whether the nondisclosure is completely harmless but of determining whether the omitted evidence would have created a reasonable doubt as to defendant's guilt that did not exist otherwise. We believe that, at the very least, the same strict standard of materiality should apply in

cases, as here, where the evidence is not produced because it was innocently destroyed by the state. In both cases, no specific request from the defense put the prosecutor on notice of its possible materiality.

We therefore hold that the erasure of the videotapes in this case does not require reversal of appellant's conviction.

Judgment affirmed.

MR. JUSTICE GROVES, MR. JUSTICE LEE and MR. JUSTICE ERICKSON concur.